ALMON, Justice.
Eastern Shore Wastewater Treatment Facility, Inc. (“Eastern Shore”), filed an action against the City of Daphne, a municipal corporation, alleging breach of a franchise contract, fraud, gross abuse of discretion, and bad faith. The trial court submitted only the breach of contract claim to the jury, and the jury returned a $1,781,181 verdict for Eastern Shore. The trial court entered judgment on the verdict and later denied Daphne’s motion for judgment notwithstanding the verdict, but conditioned this denial on Eastern Shore’s accepting a remittitur to reduce the verdict to $745,012. Eastern Shore accepted the remittitur but, pursuant to Rule 59(f), A.R.Civ.P., reserved its right to have the jury verdict fully reinstated if Daphne appealed.
In 1979 a hurricane hit the eastern shore of Mobile Bay, severely damaging the sewage treatment plant servicing Villa Mercy Nursing Home (“Villa Mercy”), a privately owned health care facility located within Daphne’s city limits. Don Conlon of the West Alabama Environmental Improvement Authority (“West Alabama”) approached Daphne city officials about allowing West Alabama to install sewer lines to service Villa Mercy. West Alabama is the predecessor of Eastern Shore, and for clarity’s sake we will refer to these two entities as “Eastern Shore.”
In 1981 Daphne and Eastern Shore entered into a franchise agreement. The pertinent portions of this agreement provide:
“Section 2. There is hereby granted to the Authority the right, privilege, authority and franchise to acquire, own, operate, construct, enlarge and improve in the City a sanitary sewer system, for the purpose of supplying sanitary sewer service in the City and the surrounding territory and to the inhabitants thereof, *990 and to use the streets, avenues, alleys and public ways and places in the city for such purpose.
“Section 3. The City hereby grants to the Authority the right, privilege, authority and franchise at any time and from time to time during the period covered by this franchise and without any requirement as to permit or fee therefor, to lay, construct and maintain pipes and mains and other conductors, fixtures and related appurtenances in, along, across and under the streets, avenues, alleys and other public places in the City, and to repair, renew, relay and extend such pipes and mains, conductors, fixtures and related appurtenances and to make all excavations necessary therefor. Specific locations of the sanitary sewer system, and areas to be served by such systems will be approved by the City, PROVIDED, HOWEVER, plans and specifications for such construction by the Authority shall be submitted to the City for approval prior to the commencement of any construction contemplated by the Authority.
[[Image here]]
“Section 7. Nothing contained herein shall be construed to give the Authority an exclusive franchise for the purposes set forth herein, nor in any way prevent the City from constructing its own sewer systems at any time it should so desire during the term of this franchise.”
(Emphasis supplied.)
In 1982 Eastern Shore submitted to Daphne a location map and a set of plans and specifications for constructing a sewer line to Villa Mercy. Daphne approved the location and the plans and specifications, and Eastern Shore began servicing Villa Mercy.
On March 18, 1985, at a Daphne city council meeting, Eastern Shore presented to the council a map that gave proposed locations for sewer lines. The proposed locations would have serviced Daphne Middle School and would have provided a basis for sewer line service to the entire city. According to the minutes of the meeting, Councilman Bill Russell suggested that the council neither approve nor disapprove of Eastern Shore’s request until the council had had time “to study the matter and give thought to the decision to be made.” On Russell’s motion, the council voted unanimously to table Eastern Shore’s proposal.
At the next two city council meetings, on April 1 and 15, the council took no action concerning Eastern Shore’s proposal. At the May 6 council meeting, the council discussed the possibility of the city’s installing the sewer lines itself; however, the council did not' vote to approve or disapprove of Eastern Shore’s proposal. Between the May 6, 1985, city council meeting and the September 3, 1985, meeting, the city offered to buy Eastern Shore’s facility; it offered $700,000 at first and then later offered $1.2 million, but Eastern Shore and Daphne never reached an agreement on the sale. Ultimately, the city sold bonds and installed its own sewer system; Eastern Shore, which had lost money every year of its existence, was taken over by its creditors, who presently employ Eastern Shore to run the facility for them. The Eastern Shore facility still services Villa Mercy.
Eastern Shore filed this action against Daphne in November 1988, alleging breach of the franchise agreement, fraud, gross abuse of discretion, and bad faith. The trial court entered summary judgment for Daphne on the fraud and bad faith claims and directed a verdict in favor of Daphne on the gross abuse of discretion claim; this appeal thus concerns only the claim regarding the breach of the franchise agreement, which was the only claim the trial court submitted to the jury. Daphne appeals the denial of its J.N.O.V. motion, and Eastern Shore cross-appeals, asking that the verdict be reinstated without the trial court’s re-mittitur.
Daphne challenges the trial court’s ruling denying its J.N.O.V. motion by arguing that, as a matter of law, it did not breach its franchise agreement with Eastern Shore. Eastern Shore bases its claim of breach of contract on this portion of section 3 of the franchise agreement:
*991 “Specific locations of the sanitary sewer system and areas to be served by such systems will be approved by the City, PROVIDED, HOWEVER, plans and specifications for such construction by the Authority shall be submitted to the City for approval prior to the commencement of any construction contemplated by the Authority.”
Eastern Shore contends that this provision sets up a two-stage process whereby Eastern Shore first was to present to Daphne’s city council proposed locations for sewer lines and to obtain approval for the locations proposed, and then was to present to the council for further approval plans and specifications for the construction of the sewer lines. Eastern Shore argues that, while Daphne had no mandatory obligation to approve the locations that it submitted to the city council on March 18, 1985, Daphne was obligated by virtue of the provision above, either to approve or to disapprove the locations, not just to refuse to act on Eastern Shore’s proposals. Eastern Shore contends, accordingly, that by tabling its proposals on March 18, 1985, Daphne, at that time, breached the duties imposed on it by Section 3 of the franchise agreement. This was the theory of breach that Eastern Shore proceeded on at trial.
The minutes of the March 18, 1985, city council meeting state that Councilman Bill Russell said that he did not “feel the council should make a decision of this magnitude without something in writing and time to study the matter and give thought to the decision to be made.” Councilman Russell then moved to table Eastern Shore’s proposal, and the motion carried unanimously. The agreement does not impose a duty on the city council to act immediately. Absent a contractual duty to approve the locations immediately, the council was certainly entitled to delay the decision on Eastern Shore’s proposal for a reasonable time; accordingly, the council’s action in tabling Eastern Shore’s proposal on March 18 was not a breach of the franchise agreement.
Representatives of Eastern Shore continued to attend the city council meetings, demanding some action by the council. Don Conlon, president of Eastern Shore, stated that he attended city council meetings from March through September 1985. Conlon attended the May 6 meeting, and he testified that, at that meeting, he learned that Daphne was pursuing options other than Eastern Shore’s proposals about the sewer lines, including the possibility that Daphne might construct its own sewer system. He attended other council meetings and learned that the city definitely was going to construct its own sewer lines. During the time between the May 6 and the September 3 city council meetings, Conlon negotiated with Daphne as Daphne attempted to purchase the Eastern Shore facility; Daphne offered from $700,000 up to $1.2 million for the facility. Eastern Shore refused these offers.
Eastern Shore’s theory of breach is that by tabling its proposals, Daphne breached an affirmative duty either to approve or to disapprove of the location map. Considering the entire record, and especially the testimony of Don Conlon, we find that there is no doubt that Eastern Shore knew, during the entire time of the dispute, what Daphne was doing concerning its proposals.
This case simply does not present a breach of contract. Any ambiguity in section 3 of the franchise agreement does not detract from the clear and unambiguous language of section 7. Nothing in the agreement prevents the city from deferring a decision on whether to approve any plans presented by Eastern Shore or from deciding to construct its own sewer system. Furthermore, the franchise granted to Eastern Shore was not exclusive, nor could it have been exclusive, because Daphne, under the limitations of the Alabama Constitution, cannot grant an exclusive franchise. Ala. Const., Art. I, § 22; Covington Electrical Cooperative v. Alabama Power Co., 277 Ala. 162,164, 168 So.2d 5, 7 (1964); Alabama Power Co. v. City of Guntersville, 235 Ala. 136, 140, 177 So. 332, 335 (1937). In Alabama Power Co. v. City of Guntersville, Alabama Power Company sought to enjoin Guntersville from constructing an “electric distribution system.” The Court denied relief to Alabama Power, stating, in substance, that although a mu *992 nicipal Corporation grants a franchise, it is not precluded from entering into competition with the franchisee, even though the value of the franchise may be thereby wholly destroyed:
“[Alabama Power] at the time of the filing of its bill for injunctive relief, had and owned an existing, effective franchise to furnish the city of Guntersville and its inhabitants, electric energy....
[[Image here]]
“It may be that competition with the city may prove ruinous to [Alabama Power’s] business in the city of Guntersville, but this is not sufficient to justify a holding that the city cannot proceed in its proposed undertaking....”
Id. at 140, 144, 177 So. at 335, 339. Under this holding the Daphne city council was certainly entitled to pursue the course of action it took.
Undeniably, Eastern Shore wanted to provide sewage treatment for the entire city and thereby become a profitable business. Nevertheless, Daphne, acting on behalf of its citizens, exercised its contractual right to build its own sewer system, as section 7 of the franchise agreement expressly provided Daphne might do. This decision by Daphne caused Eastern Shore, which had lost money every year of its existence, to collapse financially. While the financial collapse of Eastern Shore is regrettable, it does not justify an imposition of liability for breach of contract, when Daphne did nothing more than act as it was entitled to act under the express provisions of the agreement.
The judgment is reversed because Eastern Shore did not prove a breach of contract, and a judgment is here rendered for the City of Daphne.
REVERSED AND JUDGMENT RENDERED.
HORNSBY, C.J., and JONES, ADAMS, HOUSTON and STEAGALL, JJ., concur.